[No. 36323. Department One. April 11, 1963.]

VIKING EQUIPMENT COMPANY, INC., *Respondent*, v. MINNE-APOLIS-MOLINE COMPANY, *Appellant*.*

*Karr, Tuttle, Campbell, Koch & Granberg (John F. Kru-ger* and *Robert G. Swenson,* of counsel) and *Faegre & Ben-son (Loring M. Staples,* of counsel), for appellant.

*Matsen, Clark, Cory & Matsen,* by *Newman H. Clark,* for respondent.

ROSELLINI, J.—The defendant is a manufacturer of farm implements, with its home office at Hopkins, Minnesota; and the plaintiff for some years has been in the business of distributing farm implements. In the early part of 1959, the plaintiff learned that the defendant was interested in closing its branch office in Portland and obtaining the services of a distributor to sell its products to dealers in Washington, Oregon, and parts of California and Idaho. Agents of the plaintiff contacted agents of the defendant, and a number of conferences followed.

In discussing the possibility of entering into a distributor-ship, the plaintiff's sales manager and vice-president, Lloyd

*Reported in 380 P. (2d) 469.

MacKenzie, inquired as to the volume of business which the defendant had done in the area in recent years and was told by the defendant's agent, James E. Scadden, that in 1958 it had been between $400,000 and $500,000. He promised to get the exact figures for MacKenzie, and when he returned to his office, he had them compiled for the years 1953 through 1957, and the approximate figure for 1958, which was $492,000. In the letter accompanying this tabulation, he said: "The figures listed are 'settlements' not sales to dealers, which helps."

The tabulation showed that the volume of business had been declining. MacKenzie also was interested in knowing the number of dealers which the defendant had in the area, and a list of these was given to him. It included "contract dealers" and "noncontract dealers."

The plaintiff's officers being satisfied that the volume of business which could reasonably be anticipated was sufficient to enable the company to "break even" the first year, and feeling confident that they could build up this business in future years, agreed to accept the distributorship. A written contract was signed, under the terms of which the plaintiff agreed to actively promote to the best of its ability the sale of goods covered by the contract. It provided for termination or cancellation by mutual agreement, or by either party upon giving 60 days' written notice.

After a few months of performance under this contract, the plaintiff became dissatisfied and complained to the defendant that it was felt that misrepresentations had been made by the defendant's agents. The dealers were not enthusiastic about the defendant's products, there did not appear to be as many of them as the list indicated, and it was felt that the annual volume would not reach the amount represented by the defendant's agents. The defendant's representatives, on the other hand, after a visit with MacKenzie, concluded that the slump in business was due to lack of enthusiasm and initiative on his part.

Thereafter, it was decided by the plaintiff that no further investment would be made in building up this distributorship, and in June 1959, an oral agreement was reached with

the defendant for the termination of the contract. This agreement was reduced to writing in August 1959, and reserved the rights of both parties to bring a law suit for alleged breach of the contract. This action followed, in which it was alleged that the contract was induced by fraudulent representations of the agent Scadden. The defendant denied the allegations of fraud and cross-complained for the unpaid balance due on the purchase of implements and parts and for profits which it alleged it had lost by reason of the plaintiff's failure to actively promote the sale of Minneapolis-Moline implements.

At the trial, MacKenzie testified that when he asked about "volume," he was interested in volume of sales, and that he did not feel that the quoted figures truly represented this volume. The evidence was that the figures given, as Scadden had said in his letter accompanying the tabulation, represented settlements of accounts rather than sales to dealers, and that sales to dealers had amounted to only $272,000. While the trial was lengthy and voluminous evidence was taken, there was no very clear explanation given why sales to dealers (by the defendant) should have been $220,000 less than sales by dealers. Similar differences existed every year, however, and there was no showing that they did not truly reflect the facts. A markup in prices to cover the dealer's profit would account for part of it. It was conceded that some of the money collected by the dealers each year was on old accounts, but MacKenzie testified that he had assumed this was the case, and there was no showing that the amount of such collections in 1960, on goods sold in 1959 and earlier, would not be equal to the collections in 1959 on goods sold earlier.

The record was devoid of proof that the figures submitted by Scadden to MacKenzie were inaccurate. It was plain from the testimony of MacKenzie, who, it must be remembered, was an experienced sales manager in the farm-implement business, that he knew what a "settlement" was, as that term was used in the business. It was also evident that when he asked about volume, he was interested in the volume of business done by the dealers, and not in orders

which they placed for goods which might or might not subsequently be sold.

The trial court found, however, that there had been a material misrepresentation of an existing fact, although innocently made. In examining the memorandum opinion, we can only conclude that this finding was based on the assumption that because the "settlements" (actual payments received) figure was greater than the "sales to dealers" (payments deferred), it must have been erroneous. But there was no more showing that this figure was erroneous than there was that the "sales to dealers" figure was in error. The record is simply devoid of evidence that Scadden misrepresented the volume of business done by dealers in the area, or that he did not give MacKenzie the figures in which he was interested.

The only evidence tending to show that the representation was false was the plaintiff's evidence that it had difficulties when it was organizing its operations and setting up its parts service, and found the dealers whom its salesmen contacted unenthusiastic, and further that its officers and agents had felt they would not be able to achieve the necessary volume of business to justify the venture. But the following year, 1960, when the area was taken over by a new distributorship, the volume was greater than it had been in 1958, according to the uncontradicted evidence submitted by the defendant.

One of the elements necessary to establish a fraudulent misrepresentation is, of course, the falsity of the representation. *Michielli v. United States Mortgage Co.*, 58 Wn. (2d) 221, 361 P. (2d) 758. The plaintiff's evidence falls short of the clear, cogent, and convincing proof necessary to establish that element.

There was also an allegation that the defendant had misrepresented the number and quality of dealers that it did business with in the area. The trial court found, however, that this had not been proved. In its memorandum opinion, it said on this subject:

"With respect to this matter, the Plaintiff was certainly under some burden, in view of Mr. MacKenzie's familiarity

with the territory; in view of the fact that the parties knew that Minneapolis-Moline's sub-branch was going out of business; that they were in a disorganized state in the area, to have made further inquiries with respect to the conditions —general condition—of the dealers.

"I cannot find that there is a clear, cogent and convincing set of facts presented in the testimony that there was a misrepresentation upon which the Plaintiff had relied or had the right to rely upon with respect to dealerships."

Our reading of the record convinces us that the court was not in error in making its findings on this point. The plaintiff having failed to prove its allegations of fraud, its complaint should have been dismissed.

In regard to its cross-complaint, the trial court found that, while defendant had shown that it was admittedly owed $11,562.42, it had failed to prove with any degree of certainty the amount of profits which it had lost as a result of the plaintiff's failure to actively promote the business. The defendant computed its sales loss by deducting the amount of sales to dealers in 1959 from the amount of such sales in 1958. It did not take into account the fact that sales had been declining, that the plaintiff's distributorship was in the process of being set up and could not be expected to function as efficiently as had the established branch office of the defendant, that there was considerable dissatisfaction with the defendant's products among dealers and purchasers in the plaintiff's area, and that the defendant caused some loss of business to the plaintiff by reason of the fact that it was slow in filling a number of parts orders. Furthermore, in presenting its computations of lost profits, it assumed that the plaintiff should be held liable for the entire year's losses, whereas the contract had been terminated before the year was half over.

The plaintiff did not contract to make as many sales to dealers as had been made the previous year. It did contract to actively promote the business, and this it did for the first few months of the contract, according to the trial court's findings. This was in the spring when the bulk of sales for the year could be expected to be made. Thereafter it did not actively promote the business, but it was soon under-

stood between the parties that the contract would be terminated by mutual agreement, and this was done formally in August.

 The applicable rule is found in 1 Restatement, Contracts § 331 (1), p. 515:

"Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty."

We cannot say that the trial court erred in determining that defendant had failed to produce evidence sufficient to support a finding of the amount of lost profits, without resort to speculation and conjecture.

The judgment in favor of the plaintiff is reversed and the cause remanded, with directions to enter judgment for the defendant in the amount admittedly owed it by the plaintiff.

It is so ordered.

OTT, C. J., FINLEY, HUNTER, and HALE, JJ., concur.

---

July 2, 1963. Petition for rehearing denied.